# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| KENNETH ROZYCKI, | Civil No. 15-589 (JRT/FLN) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| CITY OF CHAMPLIN, MATTHEW SMITH, *in his official and individual capacity*, and JEFF MARTIN, *in his official and individual capacity*. | |
| Defendants. | |

Paul Applebaum, **APPLEBAUM LAW FIRM**, 332 Minnesota Street, Suite W1610, St. Paul, MN 55101, for plaintiff.

Jason M. Hiveley, **IVERSON REUVERS CONDON**, 9321 Ensign Avenue South, Bloomington, MN 55438, for defendants.

Plaintiff Kenneth Rozycki brings this action against Defendants Officer Matthew Smith, Officer Jeff Martin, and the City of Champlin, alleging claims under 42 U.S.C. § 1983 and Minnesota law based on an encounter between Rozycki and the officers at Rozycki's home on April 20, 2014. Rozycki alleges that Martin and Smith violated his Fourth Amendment rights by entering his garage without a warrant or consent, tackling and restraining him – which resulted in his pants and underwear falling down for some period of time – and arresting him inside his home without a warrant or probable cause. Rozycki also alleges battery and invasion of privacy in connection with these events. All Defendants move for summary judgment on all claims.

The Court will grant Smith's and Martin's motion for summary judgment as to the § 1983 claims of arrest without probable cause and unlawful strip search; however, the Court will deny summary judgment as to the claims of unlawful, warrantless home entry and arrest and excessive force, as Smith and Martin are not entitled to qualified immunity on these claims.   The Court will grant the City of Champlin's motion for summary judgment as to all § 1983 claims because Rozycki has failed to provide any factual or legal basis for extending liability to the City.   As for the state claims, the Court will grant summary judgment as to all Defendants on Rozycki's claim of invasion of privacy, but will deny summary judgment as to all Defendants on Rozycki's claim of battery because Defendants are not entitled to official immunity.

## BACKGROUND

### I.   EVENTS OF APRIL 20, 2014

On the afternoon of Easter Sunday, April 20, 2014, Plaintiff Kenneth Rozycki was at his home in Champlin, Minnesota, with a number of family members and family friends.   Defendant Matthew Smith, a Champlin police officer, responded to a call from Rozycki's neighbor complaining of dogs barking loudly at Rozycki's home.   (Aff. of Brian P. Taylor ("Taylor Aff."), Ex. 1 ("Smith Dep.") at 11:21-13:14, May 2, 2016, Docket No. 14; Taylor Aff., Ex. 7 ("Rozycki Dep.") at 28:3-17.)   Smith arrived in the late afternoon and observed about half a dozen people in the driveway area drinking beer. (Smith Dep. at 19:20-20:11).   Rocyzki went out to the street to speak with Smith, who

remained in his squad car.  (Smith Dep. at 20:19-23, 21:18-22:15; Rozycki Dep. at 28:3-6.)  When Smith brought up the noise complaint, Rozycki became verbally agitated. (Smith Dep. at 22:16-25:6; Taylor Aff., Ex. 2 ("Jason Dep.") at 9:25-11:3; Rozycki Dep. at 29:8-30:2.)  Rozycki eventually walked away from the squad car.  (Rozycki Dep. at 29:24-25.)

Rozycki's adult son Jason Rozycki, accompanied by Jason's son, stayed near Smith's car briefly after Rozycki walked away; Jason testified that Smith muttered something along the lines of "typical Rozyckis," after which Jason said, "[y]ou want my son to respect the police but you are making comments like this."  (Jason Dep. at 11:3-21; *see also* Taylor Aff., Ex. 4 ("Jeremy Dep.") at 10:8-17.)  According to Jason, Smith apologized and left the scene.  (Jason Dep. at 11:8-9, 15:1-6.)  In contrast, Smith testified that Rozycki told him the dogs would be put inside, after which Smith drove away, with no mention of the "typical Rozyckis" statement.  (Smith Dep. at 25:5-24.)

Shortly after Smith left, Rozycki had a verbal exchange with the neighbor who had made the noise complaint.  (Taylor Aff., Ex. 5 ("Erstad Dep.") at 14:16-15:1.)  The neighbor then called 911, reporting that Rozycki had threatened her, saying "if you ever call the police on my dogs barking again, it will be the fucking last time you call." The neighbor also reported that she felt "very threatened," and that Rozycki had threatened her in the past.  (Smith Dep. at 27:17-33:23, 28:16-31:4, 33:15-23; *see also* Martin Dep. at 13:18-23.)  Rozycki testified, on the other hand, that although he did express his frustration and questioned his neighbor about why she called the police, he had not

threatened her, and one other witness in Rozycki's yard at the time also testified that Rozycki made no threat.[1]   (Rozycki Dep. at 32:7-33:10; Erstad Dep. at 15:16-19.)   Smith testified that based on this telephone call, he believed Rozycki's conduct amounted to felony terroristic threats.   (Smith Dep. at 32:4-33:14.)

Smith, Defendant Jeff Martin, a Champlin police officer, and Tony Mortinson, an Osseo police officer, responded in person to the neighbor's 911 call.   The three officers met a few blocks from Rozycki's house to discuss the situation.   (Smith Dep. at 33:24-35:9; Taylor Aff., Ex. 6 ("Martin Dep.") at 12:4-15:13; Aff. of Andrew Irlbeck ("Irlbeck Aff."), Ex. 13, May 23, 2016, Docket No. 20.)   At the time of the events in question, Martin weighed over 290 pounds and was six feet four inches tall.   (Martin Dep. at 6:25-7:6; Irlbeck Aff., Ex. 4 at 2.)   An onlooker testified (presumably referring to Martin) that one of the officers at the Rozycki home that day was "the biggest cop that [she had] ever seen."   (Matheny Dep. at 12:14.)   According to Mortinson's police report, before the trio approached the Rozycki house, Smith and Martin told him that they planned to arrest Rozycki for terroristic threats and that they expected the other people at the Rozycki home to fight the officers during the arrest.   (Irlbeck Aff., Ex. 13.)

The three officers then drove their squad cars closer to the Rozycki house, parked on the street, and approached the house on foot.   (Smith Dep. at 35:10-23, 39:16-19;

---

[1] Rozycki alleges that the neighbor who made the complaints had a history of calling the police on Rozycki, as well on her other neighbors, and that the police department was biased in the neighbor's favor.   (Rozycki Dep. at 33:1-3; 34:1-7.)

Martin Dep. at 15:12-19, 16:4-10.)  When the officers drove up, Rozycki and a number of adults were in the driveway drinking beer and the garage door was open.  (Smith Dep. at 35:18-36:8, 37:24-39:14; Martin Dep. at 15:20-23; Def. Ex. 13 at 18:24:45-50; Taylor Aff., Ex. 11 ("Coffey Dep.") at 14:23-15:20; Taylor Aff., Ex. 13 ("Smith Video") at 18:24:44-47.)  Multiple onlookers testified that it appeared as though the officers snuck up on Rozycki by walking up along the side of the house, out of Rozycki's view.  (Taylor Aff., Ex. 3 ("Countryman Dep."), at 18:15-20, 19:3-5, 22:15-24, 23:11-12; 69:9-70:7; Taylor Aff., Ex. 10 ("Matheny Dep.") at 12:1-24, 14:4-22, 16:13-17.)  The officers deny that they were sneaking up on Rozycki and testified that they merely walked up to the house from their cars in plain sight – at least one witness statement supports this version of events.[2]  (Smith Dep. at 35:18-23, 39:16-19; Martin Dep. at 16:4-17:16; Jeremy Dep. at 15:24-16:8.)

The key events in this case took place over the span of about thirty seconds,[3] starting when Smith, after walking within about fifteen feet of Rozycki's house, asked

---

[2] Smith's squad car video does not picture the officers' approach to the house.

[3] The camera inside Smith's squad car was on for the duration of the officers' encounter with Rozycki; the audio accompanying the video comes from Smith's lapel microphone.  The microphone picked up the following details: about ten seconds after exiting his squad car, Smith asked: "Ken, can I talk to you?"  (Smith Video at 18:25:01.)  Nine seconds later, Smith repeats: "Can I talk to you?"  (*Id.* at 18:25:10.)  A second or so later, Smith says "Ok, come on over here."  (*Id.* at 18:25:11-14.)  A different male voice can be heard on the recording saying "Dad just be normal."  (*Id.* at 18:25:14-16.)  Less than a second after that, Rozycki's voice says, rather forcefully, "don't come in my garage!"  (*Id.* at 18:25:16-17.)  Less than a second later, Smith states "you're under arrest" twice in quick succession.  (*Id.* at 18:25:17-19.)  By the time Smith

(Footnote continued on next page.)

Rozycki if the two of them could talk. [4]   (Smith Dep. at 39:16-40:19.)  Instead of joining

Smith for the requested conversation, Rozycki walked toward the door inside the garage

leading into the house. (Smith Dep. at 40:21-22, 42:17-43:1; Rozycki Dep. at 36:2-6.)

Smith testified that he perceived Rozycki's movement toward the interior door as an

attempt to retreat and to disobey Smith's request.  (Smith Dep. at 44:21-45:17; *see also*

Irlbeck Aff., Ex. 3 at 5.)  A few seconds later, Rozycki told the officers not to enter the

garage, and then Smith immediately told Rozycki twice that he was under arrest, ran into

the garage, and tackled Rozycki in the doorway leading into the house.  (Rozycki Dep. at

36:6-11; Smith Dep. at 43:2-45:24; Jeremy Dep. at 16:9-23; Taylor Aff., Ex. 12 ("Barrett

_____
(Footnote continued.)

announces the arrest the second time, background noise is building, and a few seconds later,
Rozycki is yelling in pain and complaining about his hip.  (*Id.* at 18:25:19-28.)

[4]  The parties do not agree about where Rozycki was standing when Smith first
approached the house.  Rozycki and others testified that he was already inside the garage and
walking toward the door to the house before he became aware of the officers.  (Rozycki Dep. at
35:12-25; *see also* Countryman Dep. at 23:19-24:6; Coffey Dep. at 15:8-24.)  Smith and Martin
testified that Rozycki was standing a few steps outside of the garage when Smith approached,
and after Rozycki saw Smith, Rozycki started moving quickly into the garage.  (Smith Dep. at
39:7-40:22, 42:18-43:5, 44:5-8; *see also* Martin Dep. at 16:12-18.)  Neither account necessarily
conflicts with the audio recording.  For purposes of summary judgment, this Court will assume
that Rozycki was in the garage when Smith started speaking to him.  Defendants concede in their
briefing that Rozycki was inside the garage when Smith first told Rozycki that he was under
arrest, which is consistent with the record (Smith Dep. at 44:9-20; Smith Video at 18:25:16-17
(Rozycki stating "don't come in my garage" just before Smith announces the arrest – wording
suggesting that Rozycki was inside the garage)).

Dep.") at 17:2-25.)  Multiple witnesses testified that Smith and Martin entered the garage and tackled and restrained Rozycki without any noticeable provocation.[5]

As a result of the tackle, both Rozycki and Smith ended up lying with the top halves of their bodies inside the door leading into the house and their legs lying in the garage on the stairs leading up to the door.  (Rozycki Dep. at 43:4-23; Martin Dep. at 19:2-15; Smith Dep. at 45:17-46:3.)  Martin entered the garage shortly after Smith did; after Smith "took [Rozycki] down to the ground," Martin assisted in restraining Rozycki by holding his legs.  (Smith Dep. at 45:17-47:8; Martin Dep. at 20:5-19; Rozycki Dep. at 39:10-11.)  Smith then stood up and Martin moved Rozycki's body down the stairs onto the concrete garage floor, where Smith and Martin continued to restrain him, rolled him onto his stomach, and handcuffed his hands behind his back.  (Smith Dep. at 46:24-47:4, 50:21-24; Martin Dep. at 20:24-25:11, 22:1-25; Rozycki Dep. at 38:8-41:25.)   Martin testified that he "slid [Rozycki] down the stairs gently," and "roll[ed] him over to place him under arrest and put his hands behind his back."   (Martin Dep. at 20:5-21:3.) Rozycki described the officers' efforts somewhat differently, testifying that they "slammed" his body into the floor, and in the process he hit his hip and the right side of his face and head on the concrete floor, causing pain to his hip.  (Rozycki Dep. at 36:11-

---

[5] Kayleigh Matheny, a neighbor watching from across the street, testified that when the officers arrived, "all of a sudden it was craziness and [the officers] just ran up and, started, like pushing through people."  (Matheny Dep. at 12:6-25; *see also id.* at 26:12-18.)  Another witness from across the street testified that Smith's and Martin's use of force against Rozycki was unprovoked and "uncalled for," since Rozycki is in his fifties and "wasn't a threat," while one of the officers (Martin) was around 300 pounds and very tall.  (Countryman Dep. at 44:25-45:15.)

15, 39:3-42:3.)  A neighbor watching from across the street testified that around the time Rozycki was tackled, she heard screaming followed by a "disturbing" sound of a body hitting the garage floor.  (Matheny Dep. at 12:24-13:3.)

The officers perceived Rozycki to be physically resisting them and repeatedly told him to stop resisting.  (Smith Dep. at 47:3; Smith Video at 18:25:25-34; *see also* Irlbeck Aff., Ex. 3 at 5; Irlbeck Aff., Ex. 4 at 5.)  Meanwhile, Rozycki and witnesses testified that Rozycki was not resisting and that starting shortly after he was tackled, Rozycki was moaning and yelling in pain, stating multiple times that his artificial hip was injured. (Barrett Dep. at 16:4-5; Matheny Dep. at 13:11-12, 21:5-7, 22:16-17; Jeremy Dep. at 20:5-17, 23:16-23; *see also* Smith Video at 18:25:22-28; Rozycki Dep. at 72:17-20.) Martin testified that during the process of handcuffing Rozycki, after he became aware of Rozycki's hip complaints, "we kind of stopped for a minute, just because we didn't want to further injure [his hips]."  (Martin. Dep. at 22:1-11.)

At some point during the course of the tackle or later restraint, Rozycki's pants and underwear were pulled down to his ankles, and he was exposed to onlookers in the garage.  (Jason Dep. at 18:1-19:3; Jeremy Dep. at 16:17-17:4; Rozycki Dep. at 48:1-50:14; Taylor Aff., Ex. 8 ("Jordan Dep.") at 25:16-27:1.)  Rozycki does not allege that the officers conducted any sort of invasive search, but he does allege that the officers waited longer than necessary to pull his pants up and did not allow his relatives and friends standing nearby to pull his pants up when they tried to do so.  (Taylor Aff., Ex. 9 ("Angela Dep.") at 14:13-22; Jason Dep. at 19:7-14, 20:16-20; Jeremy Dep. at 17:1-15;

Jordan Dep. at 26:4-11; Barrett Dep. at 15:9-14, 19:19-20:1.) It is not clear precisely when Rozycki's pants were pulled back up.[6]

Over the course of the next seven or eight minutes, Smith and Martin stood Rozycki up and walked him out of the garage, still handcuffed, where eventually they let him lie down on the ground to wait for an ambulance. (Smith Video at 18:26:30-18:30:45; Smith Dep. at 52:3-53:16; Jeremy Dep. at 23:16-24:20; Rozycki Dep. at 47:19-48:5, 50:15-51:13, 56:2-16.) During this period, the audio recording captures intermittent statements of pain, confusion, and agitation from Rozycki, as well as officer statements both explaining to Rozycki that the officers were "trying to help [him] up" and also, at other moments, abruptly ordering Rozycki to cooperate, to stand up, and to walk. (*See, e.g.*, Smith Video at 18:27:00-30, 18:28:50-29:10.) Smith testified that during this period, Rozycki collapsed in the garage at one point after standing, and also that he "went limp" and "wasn't cooperating at all anymore, and at this time he was saying that his hip or hips were sore [and that] he had artificial hips." (Smith Dep. at 52:9-17; *see also* Martin Dep. at 24:11-17.)

Whether the officers used any force against Rozycki after handcuffing him – other than the minimal force necessary to stand him up and walk him out of the garage – is a

---

[6] Rozycki testified that he remembers his pants being down at some point after he left the garage, (Rozycki Dep. at 50:9-21, 57:9), but many witnesses testified that Rozycki's pants had been pulled up by the time the officers walked Rozycki out of the garage. (Jordan Dep. at 26:12-23; Erstad Dep. at 22:15-20; Matheny Dep. at 29:13-30:23; Coffey Dep. at 25:20-26:12; *see also* Irlbeck Aff., Ex. 7 at 1.)

matter in dispute.  Rozycki alleges that at some point after he was handcuffed, an officer placed Rozycki in a chokehold, whispered "I'm sick of your bullshit Ken,"[7] and slammed his body against a car parked in the driveway.  (Rozycki Dep. at 57:9-58:7.)  Multiple witness statements support this allegation.  (Jason Dep. at 30:10-31:20; Angela Dep. at 12:16-13:5; Matheny Dep. at 28:22-29:12, 30:13-15; Coffey Dep. at 18:8-14; Barrett Dep. at 15:23-16:2, 20:9-21:6.)   While Rozycki testified that he does not remember which officer committed these acts, (Rozycki Dep. at 57:10-13), another witness testified that "the bigger cop" (presumably Martin) had Rozycki in a chokehold and "was tossing him around" after he was handcuffed, (Coffey Dep. at 18:14).  One witness also testified that when the officers walked Rozycki outside and let him lie on the ground, they "pushed him down into the ground."  (Jason Dep. at 31:21-25.)  Defendants deny that any officer on the scene placed Rozycki in a chokehold, slammed him against a car, whispered such a statement in his ear, or threw Rozycki to the ground.

At some point during Rozycki's exclamations of pain and fear about his hips possibly becoming dislocated, an officer is recorded saying: "If you wouldn't have run from me when I told you you were under arrest it wouldn't have happened," (Smith Video at 18:31:37-40), and in response a male voice chimes in: "we have a lot of

---

[7] This statement is not audible on either of the available audio recordings, but the sound on the recordings is also very muddled for many minutes.  If Martin had committed the alleged chokehold and whispered this statement, it would not necessarily have been picked up by the audio recording since Martin's lapel microphone was not on for the first eight minutes of the encounter.

witnesses," (*id.* at 18:31:40-43.)   The audio recording later captures Smith stating "I asked him to step out and talk to me and I told him you are under arrest," (*id.* at 18:32:25-45), and later, "when somebody runs from me when I tell them they're under arrest I can do anything that I need to to get them into custody," (*id.* at 18:33:05-20).

Between the moment that Smith first tackled Rozycki and the time the officers lay Rozycki on the ground outside of the garage to wait for an ambulance, the situation was tense and volatile inside the garage, according to Smith.  (Smith Dep. at 48:5-20, 49:5-50:5, 50:25-52:25; *see also* Smith Video at 18:25:45-18:26:15.)  The other individuals at Rozycki's house (including his four adult children, a few family friends, and a few children) were all watching what was going on between Rozycki and the police, and they came gradually closer to Rozycki and the officers and yelled and asked questions throughout the process.  (Smith Video at 18:26:40-18:30:00; *see also* Smith Dep. at 51:9-11; Martin Dep. at 24:3-23.)  Smith testified that the individuals in the crowd were not following police commands and the officers were afraid of what the crowd might do, especially given that many of them had been drinking.  (*See, e.g.*, Smith Dep. at 48:5-20, 51:8-24.)  The officers repeatedly yelled at the onlookers to back up, threatened them with arrest, and warded them off by holding out a taser; according to Smith, while Smith and Martin were restraining Rozycki, Mortinson was engaged in "crowd control."  (Smith Video at 18:25:28-50; Smith Dep. at 51:19-24; Rozycki Dep. at 53:1-7; Angela Dep. at 11:7-15.)  The officers did end up arresting one onlooker – Rozycki's son Jordan Rozycki – due to his conduct in the garage.  (Martin Dep. at 24:24-25:19.)  However, at least one

witness testified that when the officers ordered the witnesses to back up, the crowd complied.  (Angela Dep. at 11:13-15.)  There is also some evidence that many of the witnesses in the garage were simply trying to understand what was happening and to find a way to pull up Rozycki's pants.  (*See, e.g.*, Jason Dep. at 19:9-14; Rozycki Dep. at 50:16-20.)

After Rozycki was settled on the ground outside of the garage, he remained in handcuffs until an ambulance arrived to transport him to a hospital.  (Smith Video at 18:30:45-18:53:20; Smith Dep. at 55:9-57:15.)  There were a few people across the street who saw and heard what happened.  These witnesses' testimony generally supports Rozycki's allegations that officers snuck up on him, tackled him without provocation, and were physically forceful with him.  (*See* Smith Dep. at 51:13-18; Countryman Dep. at 14:1-14; Matheny Dep. at 7:18-8:25; Coffey Dep. at 11:10-23, 12:19-26:13.)

Defendants repeatedly point out that Rozycki testified that his memory of the events in question is a "little fuzzy" and that Rozycki had been drinking before the encounter.  Rozycki attributes his "fuzzy" memory to the officers' use of force when they allegedly slammed his head into the floor.  (Rozycki Dep. at 46:18-24, 62:3-15, 71:22-72:14, 90:19-24, 96:1-8, 107:19-23; Jason Dep. at 27:16-19; Jeremy Dep. at 28:21-29:1.)  Defendants also emphasize that Smith and Martin were familiar with Rozycki from past disturbances at the Rozycki home.  According to Smith, in his experience, even minor situations at Rozycki's residence could turn bad quickly, especially if alcohol was

involved.  (Smith Dep. at 13:15-19:2, 20:25-22:12; *see also* Jason Dep. at 11:22-13:14; Martin Dep. at 8:12-11:19.)

In the end, an x-ray showed no displacement or fractures in Rozycki's hips. Rozycki claims damages including lasting hip pain and bruising, a bruised rib, a bruised face and ear, a concussion, pain and suffering, embarrassment and mental anguish, a loss of liberty, and medical bills in the amount of $5,612.12.  Rozycki was never charged with any crime related to these events.

## II.      PROCEDURAL HISTORY

Rozycki filed this action in Minnesota state court in December of 2014, asserting a number of federal and state law claims.  Pursuant to 42 U.S.C. § 1983, Rozycki argues that Smith and Martin violated his Fourth Amendment rights by using excessive force, conducting an unlawful strip search, arresting him without arguable probable cause, and unlawfully entering his home and arresting him there without a warrant.  Rozycki also asserts state law battery and invasion of privacy claims.

Defendants removed to the District of Minnesota on February 25, 2015.  On May 2, 2016, Defendants filed a motion for summary judgment on all claims, arguing that Smith and Martin are entitled to qualified immunity in relation to the § 1983 claims, there is no basis to hold the City of Champlin vicariously liable for the alleged § 1983 violations, and the state law claims fail as a matter of law against all Defendants, or alternatively, Defendants are entitled to official immunity.

## ANALYSIS

### I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009).  If the plaintiff's version of events "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II.   SECTION 1983 CLAIMS

### A.   Smith and Martin

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Cook v. City of Bella Villa*, 582 F.3d 840, 848-49 (8th Cir. 2009) (internal quotation marks and brackets omitted).   Additionally, the doctrine of qualified immunity shields police officers from liability for civil damages, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy J., dissenting)).   The doctrine thus gives police officers "breathing room to make reasonable but mistaken judgments [and] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al–Kidd,* 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).   "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)).

In assessing whether a police officer is entitled to qualified immunity, courts consider two factors, which may be examined in either order: (1) whether the facts indicate "a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232, 236 (citation omitted). "Unless both of these questions are answered affirmatively, [the defendant] is entitled to qualified immunity." *Nord v. Walsh Cty.*, 757 F.3d 734, 738 (8th Cir. 2014).

"Although the defendant bears the burden of proof for this affirmative defense [of qualified immunity], the plaintiff must demonstrate that the law was clearly established." *Smith v. City of Minneapolis*, 754 F.3d 541, 546 (8th Cir. 2014) (quoting *Monroe v. Ark. State Univ.,* 495 F.3d 591, 594 (8th Cir. 2007)). "For a right to be considered clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Lawyer v. City of Council Bluffs*, 361 F.3d 1099, 1103 (8th Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also United States v. Lanier*, 520 U.S. 259, 270-72 (1997). "Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law. But if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." *Wimbley v. Cashion*, 588 F.3d 959, 961 (8th Cir. 2009) (quoting *Olson v. Bloomberg*, 339 F.3d 730, 735 (8th Cir. 2003)).

The Court will analyze each alleged § 1983 violation, and whether Smith and

Martin are entitled to qualified immunity, separately below.

### 1.   Probable Cause[8]

In order to comply with the Fourth Amendment, a warrantless arrest must be "supported by probable cause." *Borgman v. Kedley*, 646 F.3d 518, 522 (8th Cir. 2011). A law enforcement officer has probable cause "when the totality of the circumstances at the time of the arrest 'are sufficient to lead a reasonable person to believe that the [arrestee] has committed or is committing an offense.'" *Id.* at 523 (quoting *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 816 (8th Cir. 2010)). For qualified immunity regarding a warrantless arrest claim, officers need only have had "arguable probable cause." *Amrine v. Brooks*, 522 F.3d 823, 832 (8th Cir. 2008). Arguable probable cause protects an officer who "arrest[s] a suspect under the mistaken belief that [he] ha[s] probable cause to do so, provided that the mistake is objectively reasonable." *Id.* While the probable cause standard gives law enforcement "room for reasonable mistakes," the qualified immunity standard for a warrantless arrest claim, "affords law enforcement officials an even wider berth for mistaken judgments 'by protecting all but the plainly incompetent or those who

---

[8] Rozycki argues that if Smith and Martin were performing a *Terry* stop, that stop was not supported by a reasonable suspicion and was not conducted in a manner "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968). No *Terry* stop occurred in this case: the officers shifted abruptly from **requesting** that Rozycki talk with them to, just a few seconds later, **tackling and arresting** him. However, if there were a brief *Terry* stop, this Court finds that this stop was supported by a reasonable suspicion of criminal activity. Additionally, the stop ended when Smith announced Rozycki's arrest, so the manner in which the stop was conducted (Smith merely requesting that Rozycki step away from the group and talk with him) is of no constitutional concern.

knowingly violate the law.'" *Ulrich v. Pope Cty.*, 715 F.3d 1054, 1059 (8th Cir. 2013) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).

To determine whether there was arguable probable cause, courts first examine the criminal statute authorizing the arrest in question. *See Small v. McCrystal*, 708 F.3d 997, 1003 (8th Cir. 2013). Rozycki was arrested for felony terroristic threats[9] under Minn. Stat. § 609.713, subd. 1, which reads:

> **Threaten violence; intent to terrorize.** Whoever threatens, directly or indirectly, to commit any crime of violence with purpose to terrorize another or to cause evacuation of a building, place of assembly, vehicle or facility of public transportation or otherwise to cause serious public inconvenience, or in a reckless disregard of the risk of causing such terror or inconvenience may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $10,000, or both.

"Terrorize means to cause extreme fear by use of violence or threats." *State v. Schweppe*, 237 N.W.2d 609, 614 (Minn. 1975). A "threat is a declaration of an intention to injure another or his property by some unlawful act," and "the question of whether a given statement is a threat turns on whether the communication in its context would have a reasonable tendency to create apprehension that its originator will act according to its tenor." *Id.* at 613 (citations omitted). The statute requires either purpose, defined as "aim, objective, or intention," *id.* at 614, or reckless disregard, defined as "conscious disregard of [a] substantial, unjustifiable risk," *State v. Cole*, 542 N.W.2d 43, 52 (Minn. 1996).

---

[9] Defendants clarified in their briefing that they only argue that there was arguable probable cause to believe that Rozycki had committed felony terroristic threats.

Rozycki's neighbor reported that Rozycki made a threat that communicated an intention to kill her.  From what the officers knew at the time, Rozycki had threatened the neighbor in the past, there was an ongoing conflict between Rozycki and the neighbor over a dog barking, Rozycki had a history of activity with the police because of various disturbances, and the neighbor felt very threatened by Rozycki.[10]  Based on the neighbor's report, a reasonable officer could have concluded, in this context, that there was probable cause to believe Rozycki acted with the purpose of terrorizing the neighbor, or at least with reckless disregard of the risk of causing such terror.[11]  Therefore, Smith

---

[10] Both Smith and Martin directly participated in Rozycki's arrest, so they may be held liable if the arrest was unlawful.  *See Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997). Both Smith and Martin were also aware of the neighbor's complaint of threats, since Smith spoke with the neighbor, and Smith communicated the content of the threat to Martin before the two arrested Rozycki.  They had also both had dealings with Rozycki in the past.  Therefore, this Court's analysis of arguable probable cause applies to both Smith and Martin.

[11] Defendants also argue that the Rozycki's "deci[sion] to retreat into his house rather than speak with Officer Smith regarding the incident" was a factor that increased probable cause; the Court rejects this argument.  Smith merely requested that Rozycki speak with him; therefore, it was Rozycki's prerogative to decline this invitation.  *See Florida v. Royer*, 460 U.S. 491, 497-98 (1983) (explaining that when an officer asks an individual "if he is willing to answer some questions . . . [t]he person approached . . . need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way").  We presume that Rozycki was inside his garage at the time of the request; he was under no obligation to come out to talk with Smith.  A decision not to engage in a consensual conversation with the police is not a circumstance that gives rise to probable cause.  *Cf. id.* at 498 (explaining that when an individual declines to engage in a consensual conversation with police, "his refusal to listen or answer does not, without more, furnish" reasonable suspicion to justify a *Terry* stop).  Furthermore, at summary judgment we must conclude that Rozycki was not fleeing, but even if we did not construe the evidence in Rozycki's favor, there is scant evidence that Rozycki **was** fleeing from Smith at any point during this encounter.  Thus, the characterization of Rozycki's movement towards the door to his house as a "retreat" is questionable.

and Martin had at least **arguable** probable cause, and they are entitled to qualified immunity on the claim that they arrested Rozycki without probable cause.

Rozycki contends that he never threatened his neighbor, so Smith and Martin lacked arguable probable cause. Although Rozycki is entitled to a favorable construction of disputed facts at summary judgment, Rozycki has put forth no evidence calling into question the truth of Smith's assertion that the neighbor communicated to Smith that Rozycki threatened her. Even if it is true that Rozycki never threatened his neighbor, it was not an objectively unreasonable "mistake" for Smith and Martin to rely on the neighbor's complaint. since "officials may rely on hearsay statements to determine that probable cause exists." *Carpenter v. Gage*, 686 F.3d 644, 649 (8th Cir. 2012) (citing *Illinois v. Gates*, 462 U.S. 213, 241-42 (1983)).

Lastly, Rozycki argues that Smith and Martin had a "duty to conduct a reasonably thorough investigation prior to arresting" Rozycki, given that there were no exigent circumstances, and "probable cause does not exist [because] a minimal further investigation would have exonerated" him. *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999) (citations omitted). It would have been clearly preferable for Smith and Martin to arrest Rozycki with a warrant after an investigation or to have interviewed some of the witnesses at the scene. However, it is far from clear that questioning Rozycki or Rozycki's family members would have resulted in information negating probable cause – such questioning merely would have created a factual dispute about whether Rozycki threatened the neighbor, which would not necessarily have been enough to defeat

arguable probable cause given the totality of the circumstances. *Cf. Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1259 (8th Cir. 1998) (explaining that officers "may weigh the credibility of witnesses in making a probable cause determination," and in situations unlike this one, where there are **available and undisputed** facts defeating probable cause, officers may not ignore those facts). Smith and Martin also did not "ignore[] plainly exculpatory evidence that negated" probable cause, *Kuehl*, 173 F.3d at 651, as the record does not suggest any such evidence existed. Thus, even if they had done a bit more questioning before making the arrest, "[i]t would have taken more than a minimal further investigation to sort out the [potential] inconsistencies surrounding" Rozycki's alleged threat. *Amrine*, 522 F.3d at 833 (citations omitted).

Given the totality of the circumstances in this case, Smith and Martin's failure to conduct additional investigation after Smith asked Rozycki to talk, standing alone, does not outweigh the numerous other circumstances giving rise to arguable probable cause. Therefore, Smith and Martin are entitled to qualified immunity on the claim that they arrested Rozycki without probable cause.

### 2.     Warrantless Entry and Warrantless Home Arrest

#### a.     Warrantless Entry

The Fourth Amendment protects the home and its curtilage from unreasonable searches and seizures. U.S. Const., amend. IV. "'Curtilage' means the area to which extends the intimate activity associated with the sanctity of [one's] home and the

privacies of life." *United States v. Robbins*, 682 F.3d 1111, 1115 (8th Cir. 2012) (citations omitted).

> [C]urtilage questions should be resolved with particular reference to four factors: [(1)] the proximity of the area claimed to be curtilage to the home, [(2)] whether the area is included within an enclosure surrounding the home, [(3)] the nature of the uses to which the area is put, and [(4)] the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Dunn*, 480 U.S. 294, 301 (1987); *see also United States v. Wells*, 648 F.3d 671, 677 (8th Cir. 2011) (applying four *Dunn* factors to determine that unpaved driveway past rear of a defendant's home and into his backyard was part of the home's curtilage).

It is clearly established that warrantless entry into the home or curtilage is presumptively unreasonable absent consent. *Kentucky v. King*, 563 U.S. 452, 460 (2011). Courts have found implied consent (also referred to as an implied license) to enter curtilage pursuant to the "knock and talk" rule: "no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors – such as driveways, walkways, or similar passageways," for the purpose of making their presence known, making inquiries, or requesting consent to search. *Wells*, 648 F.3d at 679 (quoting *United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984)); *see also Florida v. Jardines*, 133 S. Ct. 1409, 1415-17 (2013). Such curtilage entry based on an implied license is only permissible when accompanied by a "legitimate law enforcement objective," *United States v. Weston*, 443

F.3d 661, 671 (8th Cir. 2006), that is "unconnected with a search directed against the accused," *United States v. Anderson*, 552 F.2d 1296, 1299-1300 (8th Cir. 1977). *See also Robbins*, 682 F.3d at 1115-16 (collecting cases). The classic application of the knock and talk rule occurs when, for example, police enter a property through an unlocked gate and proceed up the driveway to the front door to request consent to search inside a home. *See, e.g.*, *Nikolas v. City of Omaha*, 605 F.3d 539, 545-46 (8th Cir. 2010).

Even when there is no implied consent to enter, warrantless entry into the home or curtilage may also be justified if there are exigent circumstances. *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1004 (8th Cir. 2010) (citing *Payton v. New York,* 445 U.S. 573, 590 (1980)); *United States v. Ball*, 90 F.3d 260, 263 (8th Cir. 1996). "Hot pursuit of a fleeing suspect" is one such exigent circumstance, provided that there is also probable cause. *United States v. Anderson*, 688 F.3d 339, 344 (8th Cir. 2012) (quoting *King*, 563 U.S. at 460); *Wells*, 648 F.3d at 678-79. To determine whether the hot pursuit exception applies, courts consider: "(1) the gravity of the underlying offense, and (2) whether the government can demonstrate an 'immediate or continuous' pursuit of the suspect from the scene of the crime." *Anderson*, 688 F.3d at 344 (citing *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984)). Even if a serious offense is at issue, arresting officers must also satisfy the second prong in order for this exception to apply. *Id.*

### i.       Home or Curtilage

Smith and Martin are entitled to qualified immunity on Rozycki's claims of warrantless entry and home arrest unless at the time Rozycki's garage was part of the constitutionally-protected curtilage,[12] and this constitutional protection was clearly established at the time; the Court answers both questions in the affirmative.   As the Supreme Court has explained, "for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage – as the area around the home to which the activity of home life extends – is a familiar one easily understood from our daily experience."  *Oliver v. United States*, 466 U.S. 170, 182 n.12 (1984).  Applying the four *Dunn* factors, it is "easily understood" that Rozycki's garage is part of the curtilage.[13]

The first two *Dunn* factors weigh very heavily in favor of finding that the garage was curtilage.   Unlike the barn in *Dunn*, which was located approximately sixty yards from the residence, Rozycki's garage is **attached to his house**.   *See Dunn*, 480 U.S. at 302.   Typically, the *Dunn* factors are used to assess distant or ambiguous areas.  *Id.* at 301;  *see also United States v. Burston*, 806 F.3d 1123, 1127 (8th Cir. 2015); *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 598-99 (6th Cir. 1998).  Here, there is no

---

[12] The Court need not decide if the attached garage was part of the home rather than the curtilage, because, as explained herein, even if the garage was just part of the curtilage, Smith's and Martin's conduct does not fall within the "knock and talk" rule.

[13] Because the Court holds that unlawful warrantless entry occurred at the moment that Smith and Martin stepped into the garage, there is no need to analyze whether Smith's body crossing the home's threshold during the tackle was excusable because it was "de minimis."

open field or unattached structure situated many yards from the home.  Instead, the

garage is a structure so connected to the home that the two share a wall and there is an

internal door that leads from the garage to the house.[14]  Rozycki's garage is in incredibly

close proximity to the home, and it is within an enclosure surrounding the home – the

walls themselves.

The third factor also weighs heavily in favor of a finding that the garage was

curtilage.  This factor has to do with whether a space is "used for intimate activities of the

home." *Dunn*, 480 U.S. at 302.  The presence of personal items alone is sufficient to

indicate domestic use.  *Wells*, 648 F.3d at 677 (holding that a "child's wagon and sled, a

boat, a lawnmower, a rabbit hutch, and a burn barrel" indicated domestic use).

Here, Rozycki was entertaining family members and other guests in the garage.

When Smith and Martin arrived at the home, they were witnessing not just evidence of

domestic use, but domestic use itself.  Defendants ask this Court to hold that officers may

interpret a visible party in a home's curtilage as an invitation to join;[15] to the contrary, the

fact that the garage was, at the time, put to a domestic use is evidence that the garage is

---

[14] *See also Nikolas*, 605 F.3d at 546 (holding that a garage located "some thirty to forty-five feet away" from the residence was not curtilage); *United States v. Boyster*, 436 F.3d 986, 991 (8th Cir. 2006) (holding that an aerially-surveilled field "located over 100 yards from the residence" was not curtilage); *United States v. Anderson*, 552 F.2d 1296, 1300 (8th Cir. 1977) (holding, before *Dunn*, that "[t]he private property immediately adjacent to a home is entitled to the same protection against unreasonable search and seizure as the home itself").

[15] At oral argument, Defendants' counsel conceded that, as a general rule, "in most cases, [officers] can't go into the garage" just because the door is open; he argued that the existence of the party was the key reason why that general rule should not control in this case.

part of the home's curtilage.   Additionally, when courts have found that an area does not

satisfy the third prong it is often because the area in question was used for an illegal, as

opposed to domestic, purpose;[16] there is no allegation of such use here.   A visible party in

an attached garage is domestic use.

Pursuant to the fourth *Dunn* factor, Defendants argue that because Rozycki's

garage door was open, there was no reasonable expectation of privacy.[17] [18]   Certainly

---

[16] *See, e.g.*, *United States v. Mathias*, 721 F.3d 952, 956 (8th Cir. 2013); *United States v. Mooring*, 137 F.3d 595, 597 (8th Cir. 1998); *see also Daughenbaugh*, 150 F.3d at 599 ("The Supreme Court in *Dunn* placed significant weight on the officer's possession of 'objective data' that the barn in question as used to manufacture drugs." (citing *Dunn*, 480 U.S. at 302-03)).

[17] Instead of analyzing the open garage door within the context of the *Dunn* curtilage inquiry, Defendants posit that, as a stand-alone Fourth Amendment principle, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *California v. Ciraolo*, 476 U.S. 207, 213 (1986).   Defendants confuse the question of whether an area is part of the curtilage – determined by applying the *Dunn* factors – with the principle that evidence and information in officers' plain view may give rise to probable cause.

> [Rozycki] would have no cause to complain had the officers . . . observed him openly cooking methamphetamine [in the open garage], just as he would have no cause to complain had the officers observed the same through an open window in his home.   'The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares.'
>
> But an officer's ability to observe through open windows [or open door] what happens inside the home does not altogether extinguish the homeowner's otherwise reasonable expectation of privacy in the home itself.   **Not even probable cause, absent an exigent circumstance, would permit an officer to enter that home without a warrant to make an arrest or seize contraband**. . . . That a homeowner exposes some portion of his dwelling to public view is not a license for officers to treat it as a public space.
>
> Similarly, . . . a homeowner may expose portions of the curtilage of his home to public view while still maintaining some expectation of privacy in those areas.

(Footnote continued on next page.)

when the area in question is a completely open field and the defendant makes no "efforts to protect the area from observation by passersby," then the area is not curtilage. *United States v. Mathias*, 721 F.3d 952, 956 (8th Cir. 2013); *see also United States v. Boyster*, 436 F.3d 986, 991 (8th Cir. 2006). However, the Eighth Circuit has found that a single bush was sufficient to indicate an effort to maintain privacy. *Burston*, 806 F.3d at 1127. Like the bush in *Burston*, a car was parked in Rozycki's driveway in front of the open garage. Additionally, unlike a completely open field, a garage has solid walls and is a structure usually associated with some degree of privacy. Lastly, in many cases, while a closed and locked garage or barn door is evidence of attempts to keep a space private when the building is not in use;[19] it makes perfect sense for the door of a private, attached garage to be open while the resident is using it, as was the case here.

_____

(Footnote continued.)

*Wells*, 648 F.3d at 678 (quoting *Ciraolo*, 476 U.S. at 213) (emphasis added). *United States v. Contreras*, which Defendants cite extensively, is consistent with *Wells* because the garage entry in that case was justified by exigency not present in Rozycki's case – the potential for destruction of evidence before police could obtain a warrant. 820 F.3d 255, 262 (7th Cir. 2016).

[18] Defendants cite a number of Minnesota cases for the proposition that Rozycki had no reasonable expectation of privacy in his attached garage since the overhead door was open, and therefore, the garage was not part of the constitutionally-protected home or curtilage. This Court does not find Defendants' application of this non-binding precedent at all persuasive. In those cases, unlike in Rozycki's case, "knock and talk" and/or hot pursuit issues were genuinely at play, and the courts were not applying the *Dunn* factors applicable in federal courts. *See State v. Latt*, No. A06-528, 2007 WL 583222 (Minn. Ct. App. Feb. 27, 2007); *State v. Akins*, No. C4-99-1066, 2000 WL 271986 (Minn. Ct. App. Mar. 14, 2000); *Tracht v. Commissioner of Public Safety*, 692 N.W.2d 863, 865 (Minn. Ct. App. 1999).

[19] *See, e.g.*, *United States v. Gerard*, 362 F.3d 484, 488 (8th Cir. 2004) (noting that one factor weighing in favor of a finding that the detached garage was curtilage was the fact that the resident "attempted to prevent public access to his garage by placing locks on all three of the doors to the garage").

Additionally, the Eighth Circuit is "hesitant . . . to give [the fourth] factor controlling weight." *Wells*, 648 F.3d at 678.  For example, in *Jardines*, the Supreme Court found that "[t]he front porch is the classic exemplar of an area adjacent to the home" that was part of the curtilage even though the front porch was fully visible to the public.  133 S. Ct. at 1413-15; *see also United States v. Hopkins*, 824 F.3d 726, 732 (8th Cir. 2016) (analyzing *Jardines*).  Taking Defendants' argument that the garage was not curtilage to its logical conclusion, the mere fact that the door of an attached garage might be open could justify law enforcement's entry and search of the garage's contents, even when the other three *Dunn* factors weigh heavily in favor of finding that the garage was part of the home's curtilage.  However, just as an open door into a dwelling does not extinguish a resident's right to be free from warrantless searches and seizures in the dwelling, an open door to a garage that is otherwise **clearly** curtilage cannot give officers free reign to treat the garage as a public space.  *Wells*, 648 F.3d at 678.  Defendants also cite to cases that apply the "knock and talk" exception to justify officer entry into an attached garage; these cases necessarily imply that such garages are routinely considered curtilage, since the "knock and talk" exception is only applicable to curtilage.[20]

---

[20] *See, e.g.*, *Coffin v. Brandau*, 642 F.3d 999, 1012-13 (11th Cir. 2011) (finding a Fourth Amendment violation when officers entered a resident's open, attached garage, given that the resident "attempted to exercise her Fourth Amendment rights" by telling officers to leave her property and trying to close the garage door, but also suggesting that if there had been no such attempt to maintain privacy, the open garage may have constituted an implied invitation to approach the interior door under the "knock and talk" rule); *Tracht*, 592 N.W.2d at 865 ("The officers entered the [open] garage for the purpose of knocking on the service door and were not looking for evidence in the garage.  Under these circumstances we conclude that there is no basis

(Footnote continued on next page.)

It has long been established that the Fourth Amendment protects against warrantless searches and seizures in the home or curtilage, subject to the few exceptions discussed below.  *See Dunn*, 480 U.S. at 300-01; *Payton*, 445 U.S. at 589-90; *see also Mikkalson v. City of S. St. Paul*, No. 14-4208, 2016 WL 4186935, at *11 (D. Minn. Aug. 8, 2016).  Based on application of the *Dunn* factors to this case, a reasonable officer would have known that Rozycki's garage was curtilage.

### ii.     Knock and Talk

Because the Court finds that the garage was curtilage, the Court must next decide whether any exception applies that would allow for curtilage entry without a warrant. First, the Court considers whether the officers had implied consent to enter the garage under the "knock and talk" rule.  "[H]omeowners grant members of the visiting public – mail carriers, sanitation workers, neighbors, and Girl Scouts, to name a few – an implied consent to enter these areas for those purposes that accompany the normal interactions of a social, civilized society."  *Wells*, 648 F.3d at 679.  Even if a member of the public might have assumed that the open garage door amounted to implied consent to enter the garage for limited purposes – an assumption that this Court does not necessarily endorse on these facts – there is no dispute that Smith and Martin entered the garage for the express purpose of arresting Rozycki, rather than for the acceptable purposes of knock

---

(Footnote continued.)

for distinguishing the officers' entry into the garage from entering a porch to knock on a door to a house.").

and talk – to make their presence known, make inquiries, or **request consent** to search. They had no purpose in entering the garage apart from effectuating a seizure that otherwise would require a warrant.  *See Jardines*, 133 S. Ct. at 1416.  The lack of implied license is further evident from the fact that Rozycki explicitly told Smith and Martin not to enter the garage before they entered.  Thus, the knock and talk rule does not save from constitutional attack Smith and Martin's warrantless entry into the curtilage.

The contours of the implied license available to officers under the knock and talk rule were clearly established at the time.  Whether Smith and Martin's conduct was an objectively reasonable seizure "depends upon whether [they] had an implied license to enter the [garage], which in turn depends on the purpose for which they entered.  Here, their behavior objectively reveals a purpose to conduct a [seizure], which is not what anyone would think [they] had license to do."  *Jardines*, 133 S. Ct. at 1416-17.  It is clear on these facts that no reasonable officer would have believed this curtilage entry was warranted based on implied consent.

### iii.    Hot Pursuit

Second, the Court considers whether a second possible exception to the warrant requirement applies: the hot pursuit exception.  Viewing the facts in the light most favorable to Rozycki, the Court finds that Smith and Martin's warrantless entry into the garage was not justified by the exigent circumstance of hot pursuit,[21] and a reasonable

---

[21]  The only exigent circumstance that Defendants briefed is hot pursuit.  Smith additionally stated in an interrogatory that he "subdued [Rozycki] in order to make the arrest and

(Footnote continued on next page.)

officer would have understood this to be the case.  To state the obvious, "the claim of hot pursuit is unconvincing because there was no immediate or continuous pursuit of [Rozycki] from the scene of a crime."  *Welsh*, 466 U.S. at 753.

Defendants urge that *United States v. Santana*, 427 U.S. 38 (1976), muddles the question of whether the hot pursuit exception applies, such that this court is bound to find Smith and Martin are entitled to qualified immunity on their warrantless curtilage entry. In *Santana*, officers who had probable cause initiated pursuit of a suspect, with the obvious purpose of arresting her, when she was standing directly in her doorway.[22]  *Id.* at 40.  "They pulled up to within 15 feet of Santana and got out of their van, shouting 'police,' and displaying their identification.  As the officers approached, Santana retreated into the vestibule of her house."  *Id.*  The officers followed Santana into her house, without a warrant or consent, and arrested her and seized evidence in her possession.  *Id.* at 41.  In finding that the warrantless entry and arrest did not violate the

_____

(Footnote continued.)

for the safety of [his] fellow officers because [he] did not know whether [Rozycki] was attempting to acquire a weapon in his garage or from his residence."  (Irlbeck Aff., Ex. 3 at 5.) Smith's deposition testimony, on the other hand, calls into question the genuineness and reasonableness of Smith's stated fear, since he had experience with Rozycki yet he had never responded to a weapons-related call at Rozycki's house.  (Smith Dep. at 50:8-19.)  At oral argument, Defendants' counsel clarified that Smith and Martin do not claim that they were worried that Rozycki was headed into his home to grab a weapon.  Thus, while "a legitimate concern for the safety of [officers] or others" can be an exigent circumstance justifying warrantless arrest in a home, viewing the facts in the light most favorable to Rozycki, there was no such legitimate concern in this case, and furthermore, Defendants have not argued that there was such an exigency in this case.  *See United States v. Meidel*, 764 F.3d 844, 847 (8th Cir. 2014) (quoting *United States v. Kuenstler*, 325 F.3d 1015, 1021 (8th Cir. 2003)).

[22] At the time the officers first initiated the arrest efforts, the suspect in *Santana* was standing "directly" in the doorway, such that "one step forward would have put her outside [and] one step backward would have put her in the vestibule of her residence."  427 U.S. at 40 n.1.

Fourth Amendment, the Court held that when Santana was standing "directly in the doorway," she was in a public space, such that "her act of retreating into her house could [not] thwart an otherwise proper arrest." *Id.* at 42. The Court found that although the pursuit was brief, "end[ing] almost as soon as it began," that "did not render it any the less a 'hot pursuit' sufficient to justify the warrantless entry." *Id.* at 43.

In *Mitchell v. Shearrer*, the Eighth Circuit considered *Santana* and concluded that in cases where an individual is standing in his doorway, "it would be unwise to become preoccupied with the exact location of the individual in relation to the doorway. Instead, the crucial issues [in *Santana*] involved the individual's reasonable expectation of privacy and whether that individual came to the doorway voluntarily." 729 F.3d 1070, 1075 (8th Cir. 2013). Defendants contend that at the time Smith and Martin initiated the arrest, Rozycki was voluntarily in a public place, so his later attempt to "retreat" into his garage, and eventually into his home, cannot defeat the valid warrantless arrest in a public place.

*Santana* and *Mitchell* do not control this case because the Supreme Court has drawn a "firm line" at the entrance to a house. *Payton*, 445 U.S. at 590. Where curtilage also has a threshold, as is the case for a garage, the constitutional line can be no less firm.[23]  *Cf. Oliver*, 466 U.S. at 180 (explaining that historically, curtilage "has been considered part of home itself for Fourth Amendment purposes"). While the suspect in

---

[23] The parties did not brief the question of whether the curtilage of Rozycki's house extends beyond the threshold of the garage. In deciding that the garage is clearly curtilage in this case, the Court does not decide whether some area beyond the garage's threshold was curtilage.

*Santana* was in a public place when the officers began the arrest, viewing the facts in the light most favorable to Rozycki we must conclude that Rozycki was not "directly in the [garage] doorway," but rather fully inside the garage, at the moment that Smith initiated his arrest. *See United States v. Greer*, 607 F.3d 559, 563 (8th Cir. 2010) (distinguishing a *Santana* situation, when a suspect is "standing in the doorway," from a *Payton*, situation in which an officer sees a suspect through an open door and unconstitutionally crosses the threshold to arrest him). Applying the test set out in *Welsh v. Wisconsin*, it is obvious that the hot pursuit exception is inapposite, since Smith and Rozycki did not engage in "immediate or continuous pursuit" of Rozycki that began when he was in a public place.[24]

Furthermore, there were at least three officers on the scene at the time and additional backup was on the way. Even if Smith and Martin were worried about truly losing track of a fleeing suspect, the circumstances still would not justify the warrantless entry in this case. "[T]he officers knew [Rozycki] was in the house, and had enough personnel to cover the house and prevent his escape while a warrant was obtained." *Guite v. Wright*, 147 F.3d 747, 750 (8th Cir. 1998).

The hot pursuit exception does not justify Smith and Martin's warrantless entry into Rozycki's curtilage; a reasonable officer could not have concluded otherwise on

---

[24] Other hot pursuit cases also involve pursuits beginning when the suspect was in public. *E.g.*, *United States v. Schmidt*, 403 F.3d 1009, 1011-12 (8th Cir. 2005); *Anderson*, 688 F.3d at 345-46.

these facts.  Therefore, Smith and Martin are not entitled to qualified immunity on the claim of warrantless entry.

### b.  Warrantless Home Arrest

Even if supported by probable cause, a warrantless arrest may still violate the Fourth Amendment if it occurs inside the home after an unconstitutional warrantless entry.  Because Smith and Martin unlawfully entered Rozycki's constitutionally-protected curtilage when they entered the garage, and they are not entitled to qualified immunity on this point, they are also not entitled to qualified immunity regarding the subsequent warrantless arrest that occurred inside the garage.  The Fourth Amendment's "firm line" at the entrance to the house (and the curtilage entitled to the same protection as the house) "appl[ies] equally to seizures of property and to seizures of persons." *Payton*, 445 U.S. at 590; *see Guite*, 147 F.3d at 750 ("It is clearly established that the Fourth Amendment prohibits a warrantless entry into a suspect's home to make a routine felony arrest absent consent or exigent circumstances." (citations omitted)).

### 3.  Excessive Force

The Fourth Amendment protects individuals against police use of excessive force. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Smith v. Kans. City Police Dep't*, 586 F.3d 576, 581 (8th Cir. 2009).  "Not every push or shove . . . violates the Fourth Amendment, but force is excessive when the officers' actions are not objectively reasonable in light of the facts and circumstances confronting them."  *Rohrbough v. Hall*, 586 F.3d 582, 585 (8th Cir. 2009) (internal quotation marks omitted).

Under the Fourth Amendment, an arresting officer has the right to use **some degree** of physical coercion in order to effect an arrest. *Henderson v. Munn*, 439 F.3d 497, 502 (8th Cir. 2006) (citing *Graham*, 490 U.S. at 396). To determine whether a particular application of force was objectively reasonable, courts apply a balancing test, weighing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 989 (8th Cir. 2009). The balancing test takes into account the totality of the circumstances, with a focus on the three factors the Supreme Court identified in *Graham v. Connor*: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officer(s) or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. 490 U.S. at 394; *see also Rohrbough*, 586 F.3d at 586. In evaluating reasonableness, courts should keep in mind the circumstances as they existed at the time, rather than relying on "the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

This Court must decide whether Smith and Martin are entitled to qualified immunity on the claim that they used excessive force when they tackled Rozycki in the garage and restrained him on the floor of the garage, as well as later when one of the officers allegedly put Rozycki into a chokehold, took him to the ground one more time,

and slammed his body into a parked car.[25]  Viewing the facts in the light most favorable

to Rozycki, there remains a genuine issue of material fact as to whether Smith and

Martin's use of force was objectively reasonable.

First, Defendants contend that when Smith tackled Rozycki, and when Smith and

Martin subsequently restrained Rozycki, moved his body down the stairs, and turned him

over onto his stomach in order to handcuff him, all force used was objectively reasonable

under *Graham* and was incident to a lawful arrest.

As an initial matter, there are genuine issues of material fact as to how much force

the officers used.  Defendants contend that Smith and Martin used the minimal amount of

force necessary to effectuate Rozycki's arrest.  However, based on the audio recording

(which captures Rozycki yelling in pain), the fact that Rozycki's pants and underwear

were likely pulled down as a result of the force of the tackle, and the voluminous witness

testimony about the excessiveness of the force used, a reasonable jury could very well

conclude that Smith and Martin used excessive force (1) when Smith tackled Rozycki

and (2) when Smith and Martin subsequently moved Rozycki to the floor and restrained

---

[25] Defendants argue that because "[l]iability for damages for a federal constitutional tort is personal," Rozycki's excessive force claims must fail as a matter of law for failure to individually identify the officers involved.  *Heartland Acad. Cmty. Church v. Waddle*, 595 F.3d 798, 805-06 (8th Cir. 2010).  Although Rozycki did testify that he does not remember precisely which of the two officers committed each act, there is evidence in the record to support the conclusion that Smith tackled Rozycki, Smith and Martin together restrained and handcuffed Rozycki, and Martin put Rozycki into a chokehold and slammed him into a parked car.  Thus, at summary judgment, Defendants' argument on this point must fail.  The cases Defendants cite, including *Wilson v. Northcutt*, 441 F.3d 586 (8th Cir. 2006), *Zimmerman v. Bellows*, 988 F. Supp. 2d 1026 (D. Minn. 2013), and *Binion v. City of St. Paul*, 788 F. Supp. 2d 935 (D. Minn. 2011), involved materially distinguishable situations.

him in the process of arresting and handcuffing him in his garage. *See Smith*, 586 F.3d at 581-82 (denying qualified immunity on an excessive force claim when a jury could find that the officers' use of force was unreasonable). There are also genuine issues of material fact as to whether Rozycki fled or resisted. Before arresting Rozycki, Smith and Martin issued no commands to Rozycki, so there is no evidence that he was resisting any command. Furthermore, based on the evidence presented, it appears that Rozycki would have had no time to comply with officer orders, had there been any orders, because Smith announced Rozycki's arrest and then, within a split second, ran after Rozycki and tackled him as he was walking towards the door of his house.

With these factual disputes in mind, the Court applies the *Graham* factors, the first of which is the seriousness of the alleged crime. "[F]orce is least justified against nonviolent misdemeanants . . . ." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009). As discussed above, Smith and Martin had arguable probable cause to arrest Rozycki based on the reported threat to his neighbor, which Smith and Martin believed at the time constituted felony terroristic threats – a somewhat more serious crime than the nonviolent misdemeanors that courts have found are not at all serious. *See, e.g.*, *Brown*, 574 F.3d at 496, 499; *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1279-80 (10th Cir. 2007). At the same time, there was no allegation that Rozycki committed a violent act. There is also evidence that at the time, it would have been reasonable for the officers to conclude that merely a non-serious spat between neighbors had occurred. Thus, the first *Graham* factor is either neutral or weighs slightly in the officers' favor.

Defendants rely on case law finding that such a takedown can be objectively reasonable when the second or third *Graham* factor is present – as a response to flight, resistance, and/or a reasonably perceived threat to officers.[26]  *See Greiner v. City of Champlin*, 27 F.3d 1346, 1355 (8th Cir. 1994) ("When an arrestee flees or resists, some use of force by the police is reasonable.")  However, pursuant to the second *Graham* factor, Defendants do not contend that they had any fear that Rozycki posed a danger to the officers or anyone else at the scene, and if they did assert such a fear, it is not clear that it would have been a reasonable fear.  When Smith and Martin arrived on the scene, Rozycki was at his home with a number of guests, it was the afternoon of a weekend holiday, and there was no indication that anything serious was happening at that moment.  Furthermore, Rozycki was in his fifties and though the officers had had previous run-ins with Rozycki, they had never known him to wield a weapon and there was no report of a weapon at the scene.  There is extensive witness testimony to the effect that Smith's tackle and Smith and Martin's subsequent use of force to detain Rozycki were wholly unprovoked.  Defendants argue that the volatile crowd of drunken adults on the scene required them to make "split-second" decisions, further justifying the force used on Rozycki.  But tensions were not high before the officers tackled and restrained Rozycki, so the subsequent exchanges between the individuals in the garage and the officers

---

[26] Defendants heavily cite an unreported Sixth Circuit case, *Bozung v. Rawson*, 439 F. App'x 513 (6th Cir. 2011).  This Court does not find *Bozung* persuasive, and even if it did, the facts are clearly distinguishable.  For example, in *Bozung* there were factors influencing the officer's decision that are not present here, including that the driver of the vehicle the plaintiff occupied had fled the scene and there was a warrant for the plaintiff's arrest.  *Id.* at 520-21.

cannot justify the use of force against Rozycki that occurred at the very beginning of the encounter.  On this record, at summary judgment the Court assumes that Rozycki did not pose a threat to anyone.

As for the final *Graham* factor, Rozycki has denied resisting arrest, and based on the other evidence presented, this denial is plausible.  Beyond the factual disputes regarding whether Rozycki fled or resisted arrest, as discussed above, Rozycki was also in the curtilage to his home at the time, so he was under no obligation to speak with Smith when Smith requested that he come outside and talk.  Therefore, at summary judgment the Court assumes Rozycki did not resist arrest.  *See Henderson*, 439 F.3d at 503.

To conclude, both the second and third *Graham* factors weigh against a finding that the force used was reasonable, and Defendants have provided no case law to support the notion that an alleged crime like the one at issue here, in the absence of danger, flight or resistance, could justify Rozycki's takedown and subsequent restraint.

Second, Defendants contest the validity of record evidence tending to show that Smith or Martin placed Rozycki in a chokehold, forcibly took him to the ground at any point after he was handcuffed, or slammed him against a car.  A reasonable jury, however, could conclude, based on the overwhelming testimony in favor of Rozycki, that such events did occur.  Additionally, Defendants do not argue that if these events took place, they would not have amounted to an unreasonable application of force,[27]  nor have

---

[27] At oral argument, Defendants' counsel agreed such force would be unreasonable.

Defendants explained what legitimate law enforcement purpose such violence could have served.  Such force would have clearly been unreasonable under *Graham*, since Rozycki was already handcuffed at the time, eliminating any risk of physical danger, and a reasonable jury could conclude that he posed no threat and was not resisting at any point after he was handcuffed.  *See Henderson*, 439 F.3d at 503 ("By the time [the suspect] was handcuffed and pinned face down on the ground, a reasonably jury could decide [he] was no longer resisting arrest, even if he had resisted arrest before being subdued.").

At the time, "[t]he right to be free from excessive force in the context of an arrest [wa]s clearly established."  *Brown*, 574 F.3d at 499.  It was also clearly established that violent removal of a homeowner from his property, even though he was not resisting arrest, is a Fourth Amendment violation.  *Smith*, 586 F.3d at 582 (citing *Samuelson v. City of New Ulm*, 455 F.3d 871, 877 (8th Cir. 2006)).  Therefore, as genuine issues of material fact remain, Smith and Martin are not entitled to qualified immunity on Rozycki's claim of excessive force when they tackled and restrained Rozycki and when they allegedly slammed him into a parked car, put him in a chokehold, and took him to the ground again after he was arrested and securely handcuffed.

### 4.    Unlawful Strip Search

The Fourth Amendment prohibits unreasonable strip searches.  The reasonableness of a strip search turns on "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."  *Bell v. Wolfish*, 441 U.S. 520, 559 (1979); *see also Richmond v. City of Brooklyn Ctr.*, 490

F.3d 1002, 1006-08 (8th Cir. 2007); *Franklin v. Lockhart*, 883 F.2d 654, 656-57 (8th Cir.

1989)).

While Rozycki's loss of his pants for a period of time was unfortunate, Rozycki

has failed to demonstrate that this event rises to the level of a constitutional violation.[28]

The parties have not provided, and this Court has not found, case law suggesting that

pants falling or being pulled down, incident to a police tackle unaccompanied by any

attempt to conduct a search, amounts to an unlawful **strip search** in violation of the

Fourth Amendment.  Even if there were a colorable argument that an unlawful strip

search occurred, the notion that such conduct might constitute a Fourth Amendment

violation was not clearly established at the time.  Therefore, Smith and Martin are entitled

to qualified immunity on Rozycki's unlawful strip search claim.

### B.      City of Champlin

A municipality cannot be held vicariously liable for the actions of its police

officers under § 1983, but it may be held directly liable for constitutional violations based

on a failure to train.  *Connick v. Thompson*, 563 U.S. 51, 60-61 (2011) (citing *Monell v.

Dep't of Soc. Servs.*, 436 U.S. 658, 691-92 (1987)).  To succeed on a failure-to-train

claim, the plaintiff must show that the municipality's failure to train amounts to

"deliberate indifference to the rights of persons with whom the untrained [officers] come

into contact."  *Id.* at 61 (quoting *Canton v. Harris*, 489 U.S. 378, 388 (1989)).  A

---

[28] At oral argument, Rozycki's counsel conceded that the unlawful strip search claim "should be trimmed away" because "it isn't the classic strip search in a jail or out in the field that's very tightly controlled by case law."

municipality may also be held liable under § 1983 for an illegal policy or custom.  To succeed on such a claim, the plaintiff must show that "municipal policy or custom is the moving force behind a constitutional violation." *Wedemeier v. City of Ballwin*, 931 F.2d 24, 26 (8th Cir. 1991).

Rozycki has failed to allege a failure to train or illegal policy or custom. Therefore, the Court must grant summary judgment in favor of the City of Champlin on all of Rozycki's § 1983 claims.

## III.   STATE LAW CLAIMS

Under Minnesota's doctrine of official immunity, "a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." *Elwood v. Rice Cty.*, 423 N.W.2d 671, 677 (Minn. 1988) (quoting *Susla v. State*, 247 N.W.2d 907, 912 (1976)).  To determine whether official immunity is available, the Court performs a two-step inquiry, asking: (1) whether the alleged acts are discretionary or ministerial; and (2) if the acts were discretionary, whether they were malicious or willful.  *Id.*  A defendant is "entitled to summary judgment on the basis of official immunity if there are no genuine issues of material fact tending to show" that the defendant's discretionary acts were malicious or willful.  *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994).

In this case, the parties do not dispute that Smith's and Martin's acts were discretionary.  Application of official immunity instead turns on whether Smith's and

Martin's acts were malicious and willful.  In the context of official immunity, malicious and willful are synonyms and mean "the intentional doing of a wrongful act without legal justification or excuse." *Rico v. State*, 472 N.W.2d 100, 107 (Minn. 1991) (quoting *Carnes v. St. Paul Union Stockyards Co.*, 205 N.W. 630, 631 (Minn. 1925)).  Put another way, an act is malicious and willful if it is intentional and the "official has reason to believe [it] is legally prohibited."  *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 663 (Minn. 1999).

## A.   Battery

Battery is defined as "an intentional unpermitted offensive contact with another." *Paradise v. City of Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980).  Furthermore, "[a] peace officer making an arrest may not subject the person arrested to any more restraint than is necessary for the arrest and detention."  Minn. Stat. § 629.32 (2016).  "[I]f the officers in this case used excessive force, their touching of plaintiff would be unpermitted and thus constitute a battery." *Paradise*, 297 N.W.2d at 155.

As discussed above, there remains a genuine issue of material fact as to whether Smith and Martin used unreasonable force against Rozycki when Smith tackled him, Martin allegedly put him into a chokehold, tackled him, and slammed him into a car, and Smith and Martin together physically restrained him.  If Smith and Martin used excessive force, then they had reason to know that their conduct was legally prohibited.  Therefore, they are not entitled to official immunity on Rozycki's battery claim.  Furthermore, the facts viewed in the light most favorable to Rozycki indicate that Smith and Martin did

engage in intentional, unpermitted offensive contact with Rozycki because they used excessive force; thus Smith and Martin are not entitled to summary judgment on Rozycki's battery claim.

Additionally, because Smith and Martin are not entitled to official immunity on Rozycki's battery claim, the City of Champlin is not entitled to vicarious official immunity on the claim, *Wiederholt v. City of Minneapolis*, 581 N.W.2d 312, 316-17 (Minn. 1998), and the City is not entitled to summary judgment on the battery claim, Minn. Stat. § 466.02 (2016).

### B.    Invasion of Privacy

Any allegation that Smith or Martin pulled down Rozycki's pants and underwear willfully or maliciously is not supported by the record.  In his briefing, Rozycki appears to have abandoned this claim.  Additionally, there was no "strip search" amounting to a Fourth Amendment violation, as discussed above.  Because there is little evidence that Smith and Martin acted willfully or maliciously, they are entitled to official immunity on Rozycki's invasion of privacy claim, and by extension, the City of Champlin is entitled to vicarious official immunity on this claim.  *Wiederholt*, 581 N.W.2d at 316-17.

This case will be placed on the Court calendar's next available trial date.

### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 11] is **GRANTED in part** and **DENIED in part**, as follows:

- 44 -

1.      Defendants' motion with respect to Rozycki's § 1983 excessive force claim against Smith and Martin, as alleged in Count 1 of the Complaint, is **DENIED**.

2.      Defendants' motion with respect to Rozycki's § 1983 claim alleging warrantless home entry and unlawful arrest by Smith and Martin, as alleged in Count 3 of the Complaint, except for the allegation that Smith and Martin arrested Rozycki without probable cause, is **DENIED**.

3.      Defendants' motion with respect to Rozycki's claim of battery against all Defendants is **DENIED**.

4.      Defendants' motion in all other respects is **GRANTED**.


DATED:  December 30, 2016                    ___s/ John H. Tunheim___
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                               Chief Judge
                                                  United States District Court